COMMONWEALTH *vs.* MATTHEW MAHONEY
(and a companion case[1]).

Middlesex. December 6, 1989. - March 7, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Required finding, Severance, Empanelment
of jury, Examination of jurors, Judicial discretion, Deliberation of jury,
Interrogation of jurors. *Joint Enterprise. Evidence*, State of mind, Re-
lating to deliberation of jurors. *Jury and Jurors. Judge. Witness*, Ex-
pert. *Evidence*, Expert opinion. *Constitutional Law*, Jury.

At a murder trial, there was sufficient evidence to warrant findings by the
    jury that a defendant had joined with two others to administer a beat-
    ing to the victim, and that the three knew, or should have known, as the
    beating progressed, that the victim could suffer grave injury or death,
    and consequently, the evidence was sufficient to justify the jury in con-
    victing the defendant of manslaughter on the theory that he had partic-
    ipated along with the others in a joint venture. [845-848]
The judge at the murder trial of two defendants acted within his discretion
    in denying one defendant's motion for severance where, on the evidence
    taken as a whole, the defendant had not demonstrated that the joint
    trial deprived him of a fair trial in any respect. [848-849]
At a murder trial, the judge did not abuse his discretion, in the circum-
    stances, in deciding that a foundation had not been established for indi-
    vidual voir dire of a juror, who had indicated on a confidential question-
    naire prepared for jury service that her home had been "robbed." [849-
    851]
At a murder trial, the judge did not abuse his discretion in permitting a
    chemist, who was generally qualified in chemistry but not specifically
    qualified in the chemistry of residual stomach contents, to offer an ex-
    pert opinion that certain substances found after the crime were consis-
    tent with being residual stomach contents. [851-853]
The defendants in a criminal case incurred no prejudice from the judge's
    excluding defense counsel from a postverdict interview with a juror who
    had written a letter to the judge complaining about the jury's delibera-
    tions. [853-856]

[1]Commonwealth *vs.* James Santos.

INDICTMENTS found and returned in the Superior Court Department on November 6, 1986.

The cases were tried before *Robert A. Barton,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Stephen Hrones* for Matthew Mahoney.

*Richard Abbott* for James Santos.

*Edward D. Rapacki,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A grand jury returned indictments against the defendants, Matthew Mahoney and James Santos, and a third man, Douglas Drager, charging them with the murder of Kirk Nilsen. The indictment against Drager was severed from those against the defendants, and the defendants' respective motions for severance from each other were denied. The indictments were put to trial before a jury in the Superior Court. At the conclusion of the Commonwealth's evidence, the judge allowed the defendants' motions for the entry of required findings of not guilty on so much of the indictments as charged murder. The jury were instructed on the elements of manslaughter, and they found each defendant guilty of that crime. The defendants have appealed. We transferred their appeals to this court on our own motion. Santos, represented by new counsel on appeal, argues that the judge erred in denying his motion for a required finding of not guilty on the manslaughter charge, and his motion for a severance. Mahoney, represented by his trial counsel, argues that the judge erred in failing to allow individual voir dire of a juror who indicated on a confidential questionnaire that she had been the victim of a burglary. Both defendants argue that the judge erred in permitting the expert testimony of a chemist, and in excluding counsel from a postverdict interview with a juror who had written a letter to the judge complaining about deliberations. We affirm the judgments of conviction.

There was evidence in the Commonwealth's case of the following. On the night of August 27, 1986, the victim, Kirk Nilsen, the defendants, Mahoney and Santos, Douglas

Drager, and several other people were at an apartment in the building at 1235 Middlesex Street in Lowell. The group was drinking beer and Sambuca liqueur, and several members, including the victim, were taking cocaine.

At some point, a fight broke out between Santos and the victim. The fight escalated into what was called a "barroom brawl" as Mahoney, Santos, and Drager began shoving and punching the victim. A witness, Pamela Roberts, saw kicking going on but could not identify who was doing it. The victim asked to be left alone but he was pushed out of the apartment and into the outer hall. Roberts heard banging noises coming from that hall for about ten minutes. Drager returned to the apartment and stated that the victim was "down in the parking lot."

A second witness, Vaughn O'Neill, indicated that she saw the victim pushed back through her apartment door and laid face down on the rug. O'Neill yelled, "Turn him over; he'll aspirate his own vomit." Santos was seen kneeling over the victim putting his hands in the area between the victim's neck and shoulders, and shaking him. According to O'Neill, the victim's head "may have" struck the floor as Santos shook him. O'Neill also heard "banging and cracking" when Santos was standing over Nilsen. Mahoney was seen grabbing a piece of lead crystal and hitting the victim "once or twice" on the left side of his head. After the assault, Drager indicated that he would give the victim a ride home.

The victim's lifeless body was found the next morning by a custodian mowing the lawn of the Digital Equipment plant in Hudson, New Hampshire. A pathologist testified that the victim had been killed by multiple blunt force injuries to his head, neck, and chest.

The foregoing outlines the general picture sketched by the testimony of the Commonwealth's witnesses. Other facts and evidence will be recounted in the discussion of the issues raised by the defendants.

1. *The motion of Santos for a required finding of not guilty.* Santos argues that his motion for a required finding of not guilty on the manslaughter charge should have been

allowed because there was no evidence linking him to the homicide. Santos maintains that the Commonwealth's evidence indicates, at most, that he engaged in a fist fight with the victim, and that there is no evidence to support a finding that he struck the fatal blow or blows. In Santos' view, the case against him is governed by the principle that a guilty verdict cannot be based on conjecture or surmise. See *Commonwealth* v. *Salemme*, 395 Mass. 594, 599-600 (1985); *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). We disagree because the evidence, viewed in the light most favorable to the Commonwealth, would warrant a reasonable juror in concluding beyond a reasonable doubt that Santos, acting in concert with Mahoney and Drager, beat the victim to death. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

Santos' argument overlooks the fact that his culpability for the crime of manslaughter was predicated on the theory that he had participated along with Mahoney and Drager in a joint venture. "The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 366 (1983). The jury may infer the requisite mental state for a joint venture from the defendant's knowledge of the circumstances and subsequent participation in the crime. *Id.*

There was evidence in the Commonwealth's case that Santos, the manager of the apartment building in which the incident took place, had argued with the victim the day before the homicide over past-due rent. In the course of the argument, Santos "drop-kicked [the victim] in the head." Santos later told someone about the confrontation and said he "wouldn't be surprised" if the victim ended up in the hospital as a result of the attack. The next day, Santos told the victim that he owed four nights' rent and that he wanted to see him "tonight."

There was further evidence that Santos was in a position at the scene of the crime to give assistance to Mahoney and Drager and that he was actively involved in the savage beating the victim received. Specifically, Santos was observed inside the apartment punching the victim, continuing the attack on the victim into the outer hallway, then gripping the victim between the neck and shoulders and shaking him. There was testimony that, as Santos stood over the victim, a "cracking" sound was heard. The nature of the victim's ultimately fatal injuries was described in detail by a forensic pathologist.[2] The pathologist also testified that digested material was found in the victim's stomach and that his head injuries and high blood alcohol could have caused him to vomit. There was expert testimony by a chemist that vomit stains were detected on Santos' sneakers, as well as the victim's shirt and the rug in the hallway. There was additional evidence that Santos had given false statements to the investigating police officer, a fact which permitted the jury to draw an inference of consciousness of guilt on the part of Santos.

It was not necessary for the Commonwealth to establish that Santos struck the fatal blow or blows.[3] Rather, the

---

[2]This doctor found bruises, contusions, and abrasions about the victim's face, head, neck, and chest. The victim had a blackened left eye and extensive neck bruising. The most extensive internal injuries were to the neck and chest. The victim's thyroid and larynx cartilage was fractured, the chest was crushed, all the victim's front ribs were fractured, and there was blood in the lungs and about the brain. The neck injuries were caused by blunt force blows or strangulation and were sufficient to cause death. The injuries to the chest were severe, caused by kneeling, stamping, or jumping on the chest and also were sufficient to cause death. The victim's liver was ruptured.

[3]The reliance by Santos on *Commonwealth v. Salemme*, 395 Mass. 594 (1985), to argue that the Commonwealth had to establish that he struck the fatal blow or blows in order to convict him is misplaced. In *Salemme*, the Commonwealth waived any joint venture theory, electing to rely on a theory that only one of two persons killed the victim. *Id.* at 598 n.5. The court in *Salemme* noted that "in this case there were two persons, Salemme and Halloran, with apparently equal opportunity to commit the murder. *Given the Commonwealth's abandonment of a joint venture theory*, it had to prove beyond a reasonable doubt that Salemme fired the

Commonwealth's evidence was sufficient to warrant findings by the jury that Santos, Mahoney and Drager had joined together to administer a vicious beating to the victim, and that the three knew, or should have known as the beating progressed, that the victim could suffer grave injury or death. The Commonwealth's evidence therefore was sufficient to justify the jury in convicting Santos of manslaughter.

2. *Severance.* Santos also argues that his motion to sever his trial from Mahoney's should have been allowed because his defense and Mahoney's were mutually antagonistic and irreconcilable. To support his contention, Santos relies upon our decision in *Commonwealth* v. *Moran*, 387 Mass. 644, 651-661 (1982). The *Moran* decision does not apply to this case.

"In this Commonwealth severance is usually a matter within the sound discretion of the trial judge. . . . Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice time and energy to serve upon juries, and avoids the necessity of recalling witnesses to successive trials. . . . Such considerations, however, must yield at some point to the rights of the accused. That point is reached when the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial. In such circumstances, and upon the making of a timely motion, failure to sever constitutes an abuse of discretion." (Citations omitted.) *Commonwealth* v. *Moran, supra* at 658.

*Moran* involved a situation that went well beyond inconsistent trial strategies among defendants. In *Moran,* "the Commonwealth introduced convincing evidence that at least one defendant, but not necessarily both of them, robbed and killed [the victim]. The only realistic escape for either defendant was to blame the other. . . . [The two defendants']

---

fatal shot" (emphasis supplied). *Id.* at 601. Here the Commonwealth expressly proceeded on a joint venture theory, and, as a result, the Commonwealth did not have to show that it was not in the power of any other person than the defendant to commit the crime.

defenses were mutually antagonistic and irreconcilable. The prejudice to each defendant was compelling. Tried together, neither defendant could have a fair trial." *Id.* at 659. In this case, by comparison, while Santos tried to downplay his involvement in the incident, he and Mahoney chose not to blame each other. Both decided to place the major blame for the crime on Drager.[4] By pursuing that strategy, both defendants substantively shared a common approach to raising a reasonable doubt. Moreover, there was testimony from two eyewitnesses which permitted the jury to conclude that both Mahoney and Santos were jointly involved in the brutal attack on the victim that led to his death. This fact has relevance to a determination whether severance was improperly denied. See *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 853 (1988); *Commonwealth* v. *Sinnott*, 399 Mass. 863, 874-875 (1987). On the evidence taken as a whole, Santos has not demonstrated that his joint trial with Mahoney deprived him of a fair trial in any respect.[5] The judge acted within his discretion in denying Santos' motion for severance.

3. *Mahoney's motion for voir dire of a juror.* Mahoney argues that the judge improperly denied his request for individual voir dire of a particular juror. See G. L. c. 234, § 28 (1988 ed.). Because he was forced to use a peremptory challenge on this juror, and subsequently exhausted those chal-

---

[4]In closing argument, Santos' attorney repeatedly insinuated that Drager had killed the victim and that Vaughn O'Neill, Drager's girlfriend, had tried to shield him from culpability. Mahoney's attorney was more direct before the jury: "Can there be any doubt in your mind that Drager is the killer and Vaughn is protecting him?"

[5]Santos makes a weak argument that hearsay testimony admitted against him at the trial (Vaughn O'Neill testified that Santos had told her by telephone that he loved her), would not have been admitted had he been tried separately. Santos argues that the testimony put him "in a bad light, declaring love for another fellow's woman," and otherwise prejudiced him. There was evidence in the Commonwealth's case that, prior to the beating, the victim had made sexual advances to O'Neill which infuriated Drager and the defendants. O'Neill's testimony most likely would have been admissible at a separate trial as showing Santos' state of mind, thus indicating an additional motive for Santos to participate in the beating. See *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355 (1957).

lenges before noting for the record his dissatisfaction with the empanelled jury, Mahoney claims reversible error. Cf. *Commonwealth* v. *Susi,* 394 Mass. 784 (1985). We reject the argument.

The particular juror had indicated on a confidential questionnaire prepared for jury service that her home had been "robbed." Mahoney's trial counsel asked the court "for further inquiry to see whether [the crime] would affect her ability to be an impartial juror." In denying counsel's request, the judge stated that "the questions [he had] asked [the prospective jurors] as a group [had covered] their fairness and impartiality." Previously, the judge had asked the prospective jurors: "Are any of you sensible of any bias or prejudice in relation to any of the parties in this case, or is there any reason why you do not stand indifferent on this case?" There had been no affirmative response to this inquiry.

General Laws c. 234, § 28 (1988 ed.), advises a trial judge, upon motion, to examine each prospective juror under oath to discover "whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein. . . . [I]f it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case . . . the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations . . . [and such examination] shall be conducted individually and outside the presence of other persons about to be called as jurors or already called." Under this statute, a trial judge is not required to engage in individual voir dire of a juror unless, according to the statute, "it appears that [a prospective] juror may not stand indifferent" because of outside considerations. The judge alone makes this threshold determination. *Commonwealth* v. *Boyer,* 400 Mass. 52, 55 (1987). *Commonwealth* v. *Sheline,* 391 Mass. 279, 290 (1984). *Commonwealth* v. *Shelley,* 381 Mass. 340, 352 (1980). "And [the determination] will not be disturbed on appeal unless the complaining party demonstrates that there was a substantial

risk that the case would be decided in whole or in part on the basis of extraneous issues." *Commonwealth* v. *Sheline, supra* at 290-291.

In this case, the judge was entitled to accept the suspect juror's declaration, made during general questioning of the venire, that she was disinterested and not impeded by any emotional or intellectual commitment. See *Commonwealth* v. *Bianco*, 388 Mass. 358, 368 (1983). The bare assertion now made that, because a prospective juror has been the victim in the past of a property crime, this renders the juror unfit, or subject to discrete questioning, does not furnish a basis for concluding that the juror harbors a general bias against defendants.

We agree with the Commonwealth that Mahoney's claim goes too far. The juror was not identified as maintaining any bias or prejudice, and the offense involved at Mahoney's trial (murder/manslaughter) differs from the crime reported by the juror (burglary). We have been skeptical of claims as far reaching as the one Mahoney makes. See *Commonwealth* v. *Boyer, supra* at 56 (individual voir dire not required in case of sexual nature involving a homosexual); *Commonwealth* v. *Sheline, supra* at 291 (individual voir dire not required when police are witnesses); *Commonwealth* v. *Shelley, supra* at 353 (individual voir dire not required when psychiatrists testify). The judge did not abuse his discretion in deciding that a foundation for individual voir dire of the juror had not been established.[6]

4. *Testimony of the chemist.* Both defendants argue that the judge abused his discretion in permitting Robert P. Pino, a chemist at the Department of Public Safety, to offer an

---

[6]Mahoney also argues that the judge erred in denying his motions for individual voir dire of all jurors, and for posing twenty-six specific questions to them. Regarding the first argument, individual voir dire is not required except as called for by G. L. c. 234, § 28. It was not required here. Regarding the second argument, only questions designed to reveal "racial bias or any similarly indurated and pervasive prejudice" are constitutionally required. See *Commonwealth* v. *Boyer, supra* at 55, and cases cited. Mahoney has not shown any foundation for his request.

expert opinion that a substance found on O'Neill's rug, the victim's shirt, and the Santos' footwear was consistent with residual stomach contents (vomit). According to the defendants, while Pino was generally qualified in chemistry, he was not specifically qualified in the chemistry of residual stomach contents.

Pino testified during voir dire that he had a bachelor of science degree in chemistry, had attended several training sessions in chemical analysis, had worked at a State police crime laboratory for several years, had taught criminalistics at a college, and had testified as an expert witness more than seventy-five times in courts of the Commonwealth. Pino admitted that he had never analyzed residual stomach contents before this case, but stated that he was familiar with its chemical properties. In conducting his analysis, Pino consulted a textbook published by the London police. He performed an accepted scientific test to determine the acidity of the stains. He also observed the stains microscopically on a slide. Based upon these tests and observations, Pino concluded that the substance in the stains was vomit.

A judge has wide discretion in qualifying a witness to offer an expert opinion on a particular question, *Commonwealth* v. *Seit*, 373 Mass. 83, 92 (1977); *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975), and his determination will not be upset on appeal if any reasonable basis appears for it. *Commonwealth* v. *Bellino*, 320 Mass. 635, 638, cert. denied, 330 U.S. 832 (1947). *Commonwealth* v. *Siano*, 4 Mass. App. Ct. 245, 248 (1976). In qualifying an expert witness, the question for judicial decision is whether the witness has sufficient skill, knowledge, and experience in the area of his training to aid a jury. *Commonwealth* v. *Boyd, supra* at 182. There is no requirement that testimony on a question of discrete knowledge come from an expert qualified in that subspecialty rather than from an expert more generally qualified. *Letch* v. *Daniels*, 401 Mass. 65, 68 (1987).

Although Pino had no particular training in the chemical analysis of residual stomach contents, he was, in general, a well-qualified chemist. He had a degree in chemistry and ad-

vanced training in chemical analysis, and experience in forensic chemistry. Pino had worked in a State police crime laboratory, had taught criminalistics, and had testified in court on numerous occasions. The procedures he used were based on accepted techniques. Based on Pino's education, training, and experience, and his use of proper methodology to study the subject before him, the judge was warranted in concluding that the jury would be helped by his testimony and that it was for them to determine the weight to be given to it. There was no abuse of discretion.

5. *Postverdict inquiry of a juror.* Both defendants argue that a new trial is required because the judge excluded their counsel from a postverdict interview with a juror who had written a letter to the judge complaining about the deliberations. There is no basis to require a new trial.

On January 13, 1988, eleven days after the jury had reached and affirmed their verdicts, a juror sent the judge a letter reading in pertinent part as follows: "I also listened each day as you told us not to speak to anyone or read anything about this case. I took this as being the [l]aw . . . but I'm not so sure if other jurors did. . . . We were told to confine our deliberations to the evidence. . . . I do not believe this happened. There are far too numerous things that happened to put down on paper." The judge provided a copy of the letter to counsel for the defendants and to the prosecutor. Trial counsel for Santos thereafter filed a motion requesting that the judge conduct an in camera interview of the juror, or, in the alternative, that the judge permit counsel to interview her. Counsel relied upon *Commonwealth v. Fidler*, 377 Mass. 192 (1979), to support the motion. In an affidavit accompanying the motion, counsel for Santos stated that the juror's letter was the basis for the request for an inquiry. Trial counsel for Mahoney filed no written motion on the matter.

On January 22, 1988, both defendants and their counsel appeared before the judge for sentencing proceedings. The judge was advised that the juror who wrote the letter was present in the courtroom. The judge heard argument by

counsel for Santos on his motion, after which the judge allowed the motion insofar as it requested him to conduct an in camera interview of the juror. Counsel for defendant Mahoney sought to be present at the interview. The judge denied the request.

The judge then interviewed the juror. Following the interview, the judge made the following finding:

> "The Court, based upon its observations of the juror during the inquiry, [the juror's letter], the case itself and the strength of the case, and the verdict, it only being for the lesser-included offense of manslaughter, . . . finds beyond a reasonable doubt that there were no extraneous prejudicial information or improper actions during the jury deliberations in this case, and no further action will be taken by the Court on this issue."

The judge ordered a transcript prepared of the interview and directed that the transcript be impounded. We have the transcript as part of the record on appeal. The judge also noted the objection of counsel for each defendant to their exclusion from his in camera interview of the juror.

In *Commonwealth* v. *Fidler,* 377 Mass. 192, 196-197 (1979), this court authorized inquiry of jurors after they rendered their verdict in only limited circumstances and then usually only in accordance with the procedure set out in that decision, *id.* at 201-204. The judge is under "[n]o duty to investigate . . . unless . . . [there is] some suggestion or showing that extraneous matters were brought into the jury's deliberations." *Commonwealth* v. *Dixon,* 395 Mass. 149, 151 (1985). In *Commonwealth* v. *Fidler, supra* at 194, 199-200, the suggestion of possibly improper extraneous influence on the jury was contained in an affidavit signed by a juror. The affidavit contained a specific account of another juror introducing into the deliberations information that the defendant had been involved in a shooting incident that had not been mentioned in evidence at the trial. In *Commonwealth* v. *Dixon, supra* at 150, the suggestion of irregularity during

jury deliberations was contained in an affidavit signed by the defendant's trial counsel. The affidavit related a telephone conversation between trial counsel and a man who identified himself as a juror. This man alleged that out-of-court conversations with witnesses in the case had occurred and were made known to another juror. In both of these cases, based on the information contained in the respective sworn affidavits, we concluded that formal hearings were necessary to determine whether improper external influences had tainted the validity of the jury verdicts.

Unlike the *Fidler* and *Dixon* cases, the case before us does not have any independent affidavit, or sworn materials, which identify any possibly extraneous influence in specific detail. The only affidavit in the case was the one filed by trial counsel for Santos which relied solely upon the juror's letter. That letter was unsworn, and mentioned in fairly vague and general terms the juror's personal opinions about deliberations.

There was nothing in the juror's letter which necessitated an inquiry. After hearing counsel, the judge should have denied the motion before him. Nevertheless, he pressed ahead with an unnecessary interview. The transcript of that interview reveals a thorough and comprehensive inquiry. The juror was sworn. In response to careful questioning she indicated to the judge: (1) that some jurors discussed the merits of the case prior to the commencement of deliberations; (2) that the juror felt that she, and at least one other juror, had been "pressured" and "badger[ed]" into finding guilt because the jurors who concluded the defendants had been proved guilty "were very stubborn" and "[t]hey weren't going to change their minds no matter what we had to show them[;]" and (3) that some jurors were concerned about "get[ting the defendants] off the street" so they would not commit other crimes.

None of these constituted an extraneous influence on the jury. Tension between jurors favoring guilt and those favoring acquittal is part and parcel of the internal decision-making process of jury deliberations. The remark about "get[ting the defendants] off the street" is not a " 'disturbing influ-

ence' of an extraneous matter," *Commonwealth* v. *Fidler*, *supra* at 199, for the reasons explained in that decision. Finally, any disregard by jurors of instructions from the judge not to discuss the case prior to deliberations would not provide a basis to conclude that the verdicts were tainted, in the absence of any concrete facts that the discussions involved matters not in evidence. See *Commonwealth* v. *Scanlon*, 9 Mass. App. Ct. 173, 184 (1980), and compare *Commonwealth* v. *Fidler*, *supra* at 199-200. The record of the judge's inquiry of the juror therefore produces nothing which would cast doubt on the validity of the jury's deliberations.

This brings us to the defendants' arguments that they had a constitutionally protected right to have their counsel present during the in camera interview. For this proposition, they rely upon *Commonwealth* v. *Robichaud*, 358 Mass. 300 (1970), and *Commonwealth* v. *Bobilin*, 25 Mass. App. Ct. 410 (1988). These decisions are not in point because each involved an inquiry on alleged juror misconduct that had occurred *during* the trial itself. This case involves an inquiry of a juror twenty days after the trial has ended to investigate unsubstantiated general allegations. The examination was not a part of the trial itself. The interview did not constitute a critical stage of the proceedings. See *United States* v. *Wade*, 388 U.S. 218, 224 (1967); *Polizzi* v. *United States*, 550 F.2d 1133, 1138 (9th Cir. 1976); *Commonwealth* v. *Dupont*, 2 Mass. App. Ct. 566, 573 (1974).

We agree with the defendants that the *Fidler* and *Dixon* cases contemplate the presence of counsel when a judge has a proper basis for interviewing a juror in accordance with the standards set forth in those decisions. A judge who excludes counsel in such a case commits error. However, we are satisfied, in view of what has been said above, that the defendants have incurred no prejudice. See *Kotteakos* v. *United States*, 328 U.S. 750, 764-765 (1946); *Commonwealth* v. *Marini*, 375 Mass. 510, 520 (1978); *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445-446 (1983).

*Judgments affirmed.*