Hand, J.
On April 23, 2006, plaintiff Paul E. McCarthy (“McCarthy”) purchased from defendant Quirk Nissan, Inc. (“Quirk”) a 2002 Nissan Maxima (“the car”). On June 21, 2006, as a result of recurring mechanical problems with the car, including illumination of the “check engine” light and engine stalling during normal operation, McCarthy wrote to Quirk rescinding his acceptance of the car pursuant to G.L.c. 90, §7Nl/4, the Massachusetts “Lemon Law.” The letter included a G.L.c. 93A demand for relief. In a written response, Quirk disputed the existence of a “covered defect” for the purposes of §7Nl/4, and denied that McCarthy was entitled to Quirk’s repurchase of the car under that statute; but offered to reimburse McCarthy for the $29.00 cost of inspecting the car, and “to accept the vehicle in trade towards the purchase of another automobile should [McCarthy] be unhappy with the vehicle’s purchase.” Unsatisfied with Quirk’s response, McCarthy commenced this action against Quirk for its alleged violations of both the used car Lemon Law and the Consumer Protection Act, G.L.c. 93A, and for common law misrepresentation.
The case was tried to a jury. By agreement, the parties introduced the evidence on the G.L.c. 93A claim during the jury trial, but the claim was reserved by the trial judge for his decision. After trial, the jury found for Quirk on the misrepresentation claim and for McCarthy on the Lemon Law claim. Based on the jury’s verdict for McCarthy under G.L.c. 90, §7Nl/4(6),[1] the trial judge subsequently found for McCarthy on his G.L.c. 93A claim, and awarded treble damages, plus the full amount of attorney’s fees requested. Quirk has appealed on the grounds that the trial judge (1) erred in awarding G.L.c. 93A multiple damages; (2) was biased against Quirk; and (3) improperly allowed McCarthy’s expert to testily. We are not persuaded by these arguments, and affirm the judgment.
The facts found by the trial judge include the following: within a day of *160 McCarthy’s purchase of the car on April 23, 2006, the car’s “check engine” light came on. As a result of the illuminated warning light, the car failed inspection. On May 3,2006, McCarthy brought the car back to Quirk for repair; Quirk replaced the car’s air flow sensor and told McCarthy that the car was fixed. Despite this repair, the car continued to evidence mechanical problems, including a fluctuating RPM and stalling during operation. McCarthy again returned the car to Quirk on May 9, 2006; Quirk again replaced the air flow sensor. The car’s mechanical problems persisted, however, and the “check engine” light continued to come on. On June 15, 2006, McCarthy returned the car to Quirk a third time for repair. This repair was no more successful than Quirk’s prior efforts. On June 21, 2006, McCarthy returned the car to Quirk, caused a written revocation of his acceptance of the car to be sent to Quirk, and demanded relief under both G.L.c. 90, §7Nl/4 and G.L.c. 93A.
1. Quirk’s initial argument, that its actions were not so immoral, unethical, oppressive, or unscrupulous as to trigger the application of G.Lc. 93A, overlooks the fact that a violation of the Lemon Law is, as noted, a per se violation of c. 93A. Although the judge was free to find otherwise, the jury’s verdict for McCarthy on his §7N1/4 claim warranted a finding that Quirk’s acts also violated G.L.c. 93A. The trial judge committed no error in following the express mandate of §7Nl/4 in finding that Quirk violated c. 93A.
2. We also find no error in the trial judge’s decision to award multiple damages for Quirk’s violation of c. 93A. Quirk’s objections to the court’s trebling of the jury’s award include the following: that McCarthy’s demand letter was “wholly deficient,” and so could not provide a proper basis for an award of multiple damages under c. 93A; that even if the demand letter were sufficient, that there existed a “good faith dispute” about whether the car’s problems were “defects” under G.L.c. 90, §7Nl/4, thus excusing Quirk from making a reasonable response to the demand letter; that it made a good faith settlement offer in response to McCarthy’s demand; that the award of multiple damages was duplicative; and lastly, that the court’s award of attorney’s fees was excessive and unreasonable.
Turning first to the adequacy of the demand letter, we note that it is well established that a G.L.c. 93A demand letter is sufficient if it describes the plaintiff’s injuries in “sufficient detail to permit [the defendant] reasonably to ascertain its exposure.” Richards v. Arteva Specialties S.A.R.L., 66 Mass. App. Ct. 726, 734 (2006), quoting Simas v. House of Cabinets, Inc., 53 Mass. App. Ct. 131, 140 (2001). See, e.g., York v. Sullivan, 369 Mass. 157, 162-163 (1975), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975) (demand letter sufficient for G.L.c. 93A purposes where it gave defendant ‘“an opportunity to review the facts and law involved to see if the requested relief should be granted or denied’ and to enable [it] to make ‘a reasonable tender of settlement’ in order to limit the recoverable damages”). While McCarthy’s demand letter was not comprehensively detailed, it did “reasonably set forth the acts relied on” by McCarthy for the purposes of the c. 93A claim. Piccuirro v. Gaitenby, 20 Mass. App. Ct. 286, 292 (1985), citing York, supra at 162. See also Brandt v. Olympic Constr., Inc., 16 Mass. App. Ct. 913, 915 (1983). McCarthy’s demand letter identified the chronic problem for which he had brought the car in for repeated repairs (the failure of the mass air flow sensor, signaled by the illumination of the “check engine” light); provided the dates on which McCarthy brought the car in for service related to those complaints; alerted Quirk to the fact that the efforts to *161 remedy the problem by repeatedly replacing the mass air flow sensor had been unsuccessful; and advised Quirk of McCarthy’s intention to hold Quirk to its obligations under §7Nl/4 and to seek protection under G.L.c. 93A if Quirk failed to buy the car back from him. While the demand letter would likely have been more compelling had it included reference to the fact that the “check engine” light’s illumination coincided with the car’s unpredictable stalling and revving behavior, McCarthy’s failure to include that level of detail is not fatal to his claims. See, e.g., Richards, supra at 734 (demand letter sufficient where it “describes the injury in enough detail to permit the defendants reasonably (even if only roughly) to ascertain their exposure”). The letter was minimally sufficient to put Quirk on notice of McCarthy’s Lemon Law claims and to give Quirk ‘“an opportunity to review the facts and the law involved to see if the requested relief [the buyback of the car pursuant to §7Nl/4] should be granted or denied’ and to enable [Quirk] to make ‘a reasonable tender of settlement’ in order to limit the recoverable damages.” York, supra at 162-163, quoting Slaney, supra at 704.
Quirk’s argument that his good faith dispute about whether McCarthy’s reported problems with the car were “covered defects” for the purposes of §7Nl/4 is best addressed by noting the court’s implicit findings that to the extent such a dispute existed, it was not a “good faith” dispute. That is a factual determination to which an appellate court must defer, unless it is clearly erroneous. Mass. R. Civ. P., Rule 52 (c). See Barboza v. McLeod, 447 Mass. 468, 469 (2006). In light of the evidence at trial that McCarthy alerted Quirk, both orally to the various service representatives and through written notations on at least one of Quirk’s after-hours key drop-off envelopes, that the car was experiencing erratic engine revving and stalling in the course of operation, we find no clear error in the judge’s rejection of Quirk’s argument on this point. See Marlow v. New Bedford, 369 Mass. 501, 508 (1976), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948) (“A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”).
Quirk also argues that its offer to reimburse McCarthy $29.00 for the cost of the car’s inspection and “to accept the vehicle in trade towards the purchase of another automobile” was a reasonable settlement offer. Whether an offer is reasonable is a question of fact to be determined in light of the terms of the demand and all the attendant facts and circumstances. See Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 799 (1976). Quirk’s response to McCarthy’s demand, in addition to reimbursement of the $29.00 inspection fee, was “to accept the vehicle in trade towards the purchase of another automobile.” The response did not say that Quirk would pay the “repurchase price,” as that term is defined in §7Nl/4; in fact, Quirk’s offer provided McCarthy with no guidance at all about the trade-in value it would propose for the car. There was ample basis for the trial judge to have found that Quirk’s offer was “too indefinite... to be regarded as reasonable,” Leardi v. Brown, 394 Mass. 151, 166 (1985), quoting Patry v. Harmony Homes, Inc., 10 Mass. App. Ct. 1, 6 (1980), a finding implicit in the court’s ruling. See Patry, supra at 6-7 (offer must be made in form that would allow its value to be ascertained). Cf. Kohl, supra at 802 (where evidence showed that offer allowing buyer to exchange his 1973 vehicle for 1974 vehicle was worth at least $700.00, offer was sufficiently definite and justified court’s finding of *162 reasonableness for purposes of c. 93A).
The court’s award of multiple damages was not, as Quirk contends, duplicative. After trial, the jury awarded McCarthy damages of $24,615.00 on his Lemon Law claim. Given that the Lemon Law violation found by the jury was a per se violation of G.L.c. 93A, and having found that it was a wilful and knowing violation of the statute, the court further found that the violation was made in bad faith. The trial judge did not, however, make a separate award for the c. 93A violation; rather, he simply applied a multiplier of three to the jury’s award pursuant to G.L.c. 93A, §3.[2] The trebling of damages under the Consumer Protection Act is a sanction, not a theory of recovery, and is made “in addition to and not an alternative to” the remedy for the Lemon Law violation. Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 236 (1984), quoting Linthicum v. Archambault, 379 Mass. 381, 383 (1979). The trebling under c. 93A of the actual damages found by the jury was not duplicative of McCarthy’s recovery under the Lemon Law.
Quirk also objects to the court’s award of attorney’s fees as being unreasonable and excessive. The amount of an attorney’s fee award under c. 93A is within the “broad discretion of the trial judge.” Tarpey v. Crescent Ridge Dairy, Inc., 47 Mass. App. Ct. 380, 392 (1999), quoting DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 106 (1983). Any fees awarded under c. 93Amustbe “reasonable,” G.L.c. 93A, §9(4); and, as Quirk notes, to determine what amount is “reasonable,” the court generally utilizes a “lodestar” analysis.[3] In this case, there is nothing in the evidence to suggest that the court did not use a lodestar analysis or, if it did not, that its findings are inconsistent with such an analysis or otherwise amount to an abuse of discretion. The evidence supports a finding that the hourly rate charged was reasonable and within the range of rates prevailing in the community, and that the time spent on the *163 case was not “excessive, redundant, duplicative, or unproductive.” See T & D Video, Inc. v. Revere, 66 Mass. App. Ct. 461, 476-477 (2006), rev'd on other grounds, 450 Mass. 107 (2007). Although, as Quirk notes, the billing records presented to the court may have included time billed for work on the ill-fated misrepresentation claim, that claim was factually and legally related to the claims on which McCarthy prevailed. Under the circumstances of the case, particularly where the misrepresentation claim was a minor part of the evidence presented at trial, and presumably, of the preparation for trial, we find no need to separate out the attorney’s fees awarded for that claim. See Simon v. Solomon, 385 Mass. 91, 112 (1982) (where all claims arose out of same chain of events, prevailing party is entitled to fees for successful and unsuccessful claims alike). We find no abuse of discretion in the court’s award of attorney’s fees.
3. Quirk argues that it is entitled to a new trial based on judicial bias engendered, Quirk speculates, by out-of-court communications about the case between the original judge[4] and the trial judge. Rule 59(a) (1) of the Mass. R. Civ. P. permits the court to grant a new trial “for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the Commonwealth.” The decision to grant or deny such a motion is within the trial court’s discretion. However, a new trial ought not to be granted unless “it appears on a survey of the whole case that otherwise a miscarriage of justice would result.” Evans v. Multicon Constr. Corp., 6 Mass. App. Ct. 291, 295 (1978) (finding abuse of discretion in judge’s granting new trial). To justify the grant of a new trial, the error claimed must be a material one, affecting the substantial rights of the parties. Galvin v. Welsh Mfg. Co., 382 Mass. 340, 343 (1981). See also Mass. R. Civ. P., Rule 61 (“No error in either the admission or exclusion of evidence ... or in anything done or omitted by the court or by any of the parties is ground for granting a new trial... unless refusal to take such action appears to the court inconsistent with substantial justice.”). Absent a clear showing by Quirk that the trial court’s actions resulted in a miscarriage of justice or deprived it of a fair trial, the denial of its motion for a new trial must be left undisturbed. Upon review of the entire record before us, including the transcript, we find no evidence of improper bias on the part of the trial judge warranting a new trial in this case. Quirk’s arguments are, in our view, based on groundless suspicion, cynical speculation, dissatisfaction with the outcome of the case, or some combination of these factors.
Quirk’s recitation of the “facts” it alleges explain and demonstrate the purported bias is based more on surmise than on the record, a circumstance we note with some concern given the seriousness of Quirk’s accusations against the individual judges involved in the trial of this case. The record clearly indicates the following: before impanelment of the jury, the judge originally assigned to try the case recused herself based on an unsatisfactory personal experience with Quirk Volkswagen. The case was reassigned, and the trial judge went forward with the case. On the second day of trial, defense counsel advised the court that based on the judge’s denial of *164 Quirk’s motion for a directed verdict,[5] counsel believed the trial judge was biased against Quirk. In support of her position, counsel told the trial judge that in her experience as a law clerk, she knew that judges “talked among themselves. ... I believe that’s poison in the well. And I believe that your actions towards my client in this matter are showing some type of bias.” The trial judge, on the record, clearly and definitively denied having any bias in the case. After reiterating the basis for his denial of Quirk’s motion for directed verdict, the trial judge told counsel, “I have no animus toward your client I have never participated with your client in any transaction. [The originally-assigned trial judge] told me nothing. I don’t care what [the original judge] did. I listened to the facts of the case. I made a decision.” After some further discussion about the denial of the motion, the trial continued. Notably, despite alleging bias by the trial judge, defense counsel never moved for the trial judge’s recusal, or for a mistrial.[6] At the conclusion of the trial, Quirk again moved *165 for a directed verdict. In response to the trial judge’s on-the-record praise of her advocacy in the case, and the judge’s reiteration of the fact that his rulings were based on the evidence and not as the result of any bias, counsel again told the court that she believed the trial judge was biased: “I can only fathom it was because of something that [the original judge] said.” The trial judge responded by saying that he “[didn’t] know what happened with [the original judge]. I asked her to take the case when I had another case. She told me that she couldn’t do it because she had an issue with Quirk and one of her kids, and that’s all I know about.[7] So she told me that she couldn’t handle the case and it was fine to ask. I’m just telling you that I have no bias whatsoever against Quirk.” Counsel indicated some satisfaction with the trial judge’s restatement of his impartiality, and did not move for mistrial or recusal. The trial continued to its conclusion.
On appeal, however, Quirk strenuously argues that these comments by the trial judge show not only that the trial judge misrepresented to counsel the extent and content of his conversations with the judge originally assigned to the case, but also that those conversations formed the foundation for the trial judge’s bias that prejudiced him against Quirk. This interpretation is simply not tenable on the record before us. In considering whether to recuse himself from a case, a judge must “consult first his own emotions and conscience” to determine whether he is capable of ruling fairly at trial. Lena, supra at 575. It is clear from the transcript in this case that the trial judge satisfied himself that he was impartial in the matter. Second, the judge must conduct “an objective appraisal of whether... ‘his impartiality might reasonably be questioned.’” Haddad v. Gonzalez, 410 Mass. 855, 862 (1991), quoting former S.J.C. Rule 3:09, Canon 3(C)(1).[8] The key word in the analysis is “reasonably.” A judge’s impartiality might reasonably be questioned in circumstances where “he has a personal bias or prejudice concerning a party.” S.J.C. Rule 3:09, Canon 3(E) (1) (a). Here, Quirk’s best argument — although not one we accept — is that the trial judge *166 was aware that the recused judge’s family had had a negative personal experience with a different automobile dealership bearing the Quirk name. While conceding that, based on her own experiences with a dealership bearing the Quirk name, the original judge might reasonably be wary of Quirk entities, generally, we cannot see any reasonable likelihood that a professional colleague of that judge would develop a bias against Quirk on that basis. Further, we note that in determining whether the trial judge’s impartiality might “reasonably” be questioned, the arbiter of that impartiality would take into account the trial judge’s vehement and clear assertions that his interest was in the law, not the parties, and that he had no bias against any party to the litigation. The record here is clear that there was no reasonable basis to conclude that the trial judge in this case was biased against Quirk based on his communications with the judge originally assigned to hear the case.[9]
As an alternative basis for its allegations of bias, Quirk points to certain rulings made against it by the court. While Quirk sees bias in a number of rulings,[10] it focus *167 es on the court’s qualification of Dean Carlton (“Carlton”) as McCarthy’s expert witness, and the court’s decision to allow Carlton to testify. Quirk argues both that McCarthy made disclosure of Carlton later than permitted under the trial judge’s pretrial conference order, and that Carlton was not qualified to testify as an expert in the case. We find no error in either of these rulings.
With respect to the timing of McCarthy’s disclosure of his expert, we note that the scope and conduct of discovery lie within the sound discretion of the trial judge. Adoption of Paula, 420 Mass. 716, 734 (1995); Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 799 (1987). Orders pertaining to discovery will not be disturbed on appeal absent a showing of prejudicial error resulting from an abuse of discretion, Billings v. GTFM, LLC, 449 Mass. 281, 296 (2007), citing Solimene, supra, characterized by “arbitrary determination, capricious disposition, whimsical thinking, or idiosyncratic choice.” Greenleaf v. Massachusetts Bay Transp. Auth., 22 Mass. App. Ct. 426, 429 (1986). See also Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 875 (1st Cir. 1995) (successful proof of abuse of discretion in case management context requires “strong evidence that the trial judge indulged a serious lapse in judgment”). In reviewing discovery rulings, we do not substitute our judgment for that of the trial judge. Boulter-Hedley v. Boulter, 429 Mass. 808, 811 (1999). The record before us not only fails to show an abuse of discretion on the part of the trial judge, but also is devoid of any indication that Quirk objected to the timing of the expert’s identification at any time prior to the completion of trial. There is a notable lack of any defense objection, until the motions for judgment notwithstanding the verdict and for a new trial, to the timing of McCarthy’s identification of his expert, and a similar lack of any request for discovery of the expert, beyond a voir dire of his qualifications. On these facts, we find no abuse of discretion in the court’s decision to allow the expert to testify, despite the timing of the disclosure to Quirk of the expert’s identity.
The qualification of a witness to offer expert testimony is also squarely within the trial court’s broad discretion. Leibovich v. Antonellis, 410 Mass. 568, 572 (1991); Commonwealth v. Allen, 40 Mass. App. Ct. 458, 467 (1996). The court’s determination is accorded considerable deference on appeal, Cronin v. McCarthy, 22 Mass. App. Ct. 448, 449 (1986), and will stand, absent proof of an abuse of discretion. Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990). The standard of review is not the substituted judgment of the appellate court. Id. Carlton inspected McCarthy’s car. At the time of the inspection, Carlton was licensed only to repair emissions problems; his license to conduct enhanced emissions inspections had expired. By the time of trial, Carlton was licensed by the Commonwealth as an Enhanced Emissions and Safety Test site inspector. As an inspector,[11] he was not required to have the Commonwealth-endorsed model of emissions-testing equipment and, in fact, was unable to get that equipment. He did, however, have comparable equipment, and was trained in its use. Carlton testified that he was, at all relevant times, an ASE-certified master auto technician, with significant experience repairing automobiles. His *168 testimony concerning the car at issue focused on the likely reasons for the chronic illumination of the “check engine” light, the effects of the likely causes of those problems on the car’s safe operation, and the likelihood of the car passing Massachusetts emissions testing with its existing problems. In light of this testimony, there was no abuse of discretion in the judge’s qualification of Carlton as an expert. “The crucial issue,’ in determining whether a witness is qualified to give an expert opinion, ‘is whether the witness has sufficient education, training, experience and familiarity with the subject matter of the testimony,”’ McLaughlin v. Selectmen of Amherst, 422 Mass. 359, 361-362 (1996), quoting Letch v. Daniels, 401 Mass. 65, 68 (1987), to provide testimony that would be helpful to a lay jury’s understanding of the claims and defenses in the case. Id.; Keville v. McKeever, 42 Mass. App. Ct. 140, 151 (1997). Quirk’s arguments, including the assertions that Carlton lacked some qualifications possessed by its own expert[12] and had limited knowledge about the particular model automobile at issue in this case, were relevant only to the weight, rather than the admissibility, of the evidence. Blake v. Avedikian, 412 Mass. 481, 483 (1992); Letch, supra at 69. Similarly, Quirk’s allegation that McCarthy fraudulently misrepresented Carlton’s licensure as of the date on which Carlton inspected the car affected merely the weight, and not the admissibility, of the evidence.
Finally, Quirk’s arguments that the trial court failed to discharge its “gatekeeping" function under Commonwealth v. Lanigan, 419 Mass. 15 (1994) and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) are simply without merit. As noted above, the court properly exercised its discretion in permitting Carlton to testify as an expert; and his testimony, whether or not credited by the jury, was based on a proper factual foundation without any fatal methodological flaws.
4. McCarthy’s brief includes a request for appellate attorney’s fees.
Where a statute provides for attorney’s fees, appellate attorney’s fees may also be assessed. “The statutory provisions for a ‘reasonable attorney’s fee’ would ring hollow if it did not necessarily include a fee for the appeal. The right to appellate attorney’s fees under [similar] statutes is beyond dispute.” Stowe v. Bologna, 415 Mass. 20, 23 (1993), quoting Yorke Mgt. v. Castro, 406 Mass. 17, 19 (1989) (party’s right to obtain attorney’s fees pursuant to G.L.c. 186, §§14,18, and c. 93A, §9(4) includes attorney’s fees for appeal).
GML Corp. v. Massey, 2007 Mass. App. Div. 143, 147. McCarthy shall submit his claim for appellate attorney’s fees in the form prescribed in Yorke Mgt., supra, directly to this Appellate Division within two weeks of the date of this opinion. Quirk will have two weeks from McCarthy’s submission to file any written opposition.
Appeal dismissed.
So ordered.

 Section 7Nl/4(6) of G.L.c. 90 states: “A dealer’s failure to comply with any of the provisions of this section shall constitute an unfair or deceptive act under the provisions of chapter ninety-three A.”

 Quirk’s reliance on Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228 (1984) is misplaced. In that case, the plaintiff had three separate claims: breach of warranty of fitness, breach of warranty of merchantability, and Consumer Protection Act violations. The trial judge made separate awards of $735.00 on each of the two breach of warranty claims, then made a separate award of $2,205.00 (three times the base award on each of the breach of warranty claims), plus attorney’s fees, on the c. 93A claim. Id. at 232. The Supreme Judicial Court ruled that the court erred in making multiple awards for the same injury caused by the same acts. Id. at 236.

 “[T]he essence of [the analysis] is the multiplication of the ‘number of hours reasonably expended on the litigation’ by ‘a reasonable hourly rate....’ In making this calculation, the court should consider the time counsel spent on the case exclusive of hours that are excessive, redundant, duplicative, or unproductive ... The rate applied to the reasonable hours expended should be the prevailing rate in the community, taking into account the experience and qualifications of the attorneys involved ... The fee applicant bears the burden of documenting in detail the hours expended and of establishing the market rate ... After making its initial calculation, the court then may adjust the fee upward or downward based on other considerations, including the results obtained” (citations omitted). T & D Video, Inc. v. Revere, 66 Mass. App. Ct 461, 476-477 (2006), rev’d on other grounds, 450 Mass. 107 (2007).

 The initial judge assigned to the trial of this case recused herself on the basis of what was then her recent experience with Quirk Volkswagen, another Quirk dealership and not a party to this case.

 The trial judge denied the motion based on his determination that the problems McCarthy experienced with the car were “defects” for the purposes of §7N 1/4 and that those problems “substantially impaired” the “safety, use or market value” of the car in that they adversely affected both safety and use. Quirk’s erroneous interpretation of “impairment” required that the car be rendered wholly inoperable by a defect in order for that defect to be covered under the Lemon Law. Neither the plain meaning of the term “impairment,” nor the weight of judicial authority, supports Quirk’s narrow interpretation of that term. Consistent with the definition of “impair” as “to damage or make worse in some material respect,” Merriam-Webster Collegiate Dictionary (11th ed. 2003), our courts have not generally required complete mechanical uselessness before a defect may be deemed to be within the purview of the Lemon Law. See, e.g., Ford Motor Co. v. Barretts, 403 Mass. 240, 241 (1988) (accepting, for purposes of G.L.c. 90, §7Nl/4 (1986), that transmission problem with car, resulting in car’s “bunny hopping” on turns, could be a defect “substantially impair [ing] the use” of the vehicle); Mustapha v. DaimlerChrysler Co., Essex Superior Court, No. 101343 (Jan. 15, 2008) (accepting that car’s water leak might reasonably be seen as impairing use and market value of car, despite fact that car was still operable with leak); Canale v. GMC, Middlesex Superior Court, No. 97463 (Feb. 28, 2007) (finding genuine question of material fact as to whether car’s tendency to accumulate snow and ice on inside of door, thus preventing door from being opened, is “defect” for purposes of the Lemon Law).

 Although this does not necessarily mean there was no bias, we do take this into consideration when viewing the record. Commonwealth v. Fitzgerald, 380 Mass. 840, 846 (1980). ‘The law is well settled that one seeking disqualification of the judge must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.” United States v. Kelly, 519 F. Supp. 1029, 1030 (D. Mass. 1981). A party’s failure to file a motion for recusal deprives a trial judge of a contemporaneous opportunity to confront the issue directly, to “consult fast his own emotions and conscience” as to impartiality, to assess objectively any appearance of bias, and to issue an appropriate ruling. Lena v. Commonwealth, 369 Mass. 571, 575 (1976). See Fidelity Mgt. & Research Co. v. Ostrander, 40 Mass. App. Ct. 195, 202 (1996). Accordingly, a party should request recusal as soon as it becomes aware of the facts that form the basis of its claim for disqualification. Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 976 F. Supp. 84, 88 (D. Mass. 1997).

 On appeal, Quirk argues that the trial judge’s statement that the original judge “had an issue with Quirk and one of her kids” contradicts the trial judge’s earlier statement that the original judge had told him “nothing,” and is evidence of the trial judge’s bias. The argument is without merit. Based on a fair reading of the trial transcript, it is clear to us that the trial judge’s assertion that the original judge had told him “nothing,” meant that the original judge had told the trial judge nothing of significance that would in any way have an impact on the trial judge’s impartiality. There was nothing inconsistent or “inaccurate” about the trial judge’s descriptions of what the original judge told him about the case following the original judge’s decision to recuse herself. As to Quirk’s position that counsel’s allegations of bias “should have warranted the trial judge’s full disclosure of his conversation with [the original judge],” we note that counsel requested no such “disclosure” until after trial. In any event, we find that the trial judge did make the necessary disclosure, and that he satisfied the requirements of Lena in his handling of the issue.

 The language quoted in former S.J.C. Rule 3:09, Canon 3(C) (1) is substantially the same as the following language in the present Code of Judicial Conduct, S.J.C. Rule 3:09, Canon 3(E) (1), effective October 1, 2003: “the judge’s impartiality might reasonably be questioned.”

 Quirk’s citation to Matter of Orfanello, 411 Mass. 551 (1992) is inapt. The record is utterly devoid of any evidence showing “any attempt” by anyone “to tamper with a judicial disposition” in this case. Id. at 557, quoting Matter of DeSaulnier, 360 Mass. 787, 813 (1972). In Orfanello, the Court considered a case in which an attorney learned that a friend (“the second attorney”) planned to defend a criminal case scheduled for trial before a certain judge. The attorney was a friend of the judge and, in that role, had solicited the second attorney’s support for the judge’s confirmation when the judge had first been nominated to the bench. After speaking with the second attorney about the pending criminal case, the attorney arranged a lunch with the judge. In the course of the meeting, the attorney told the judge that the second attorney, the judge’s past supporter, had a case coming before the judge. To ensure that nothing was lost through this subtle exchange, having described this circumstance to the judge, the attorney told the judge, ‘"Well, I had a message, and I delivered the message.” Id. The Court cited Matter of DeSaulnier, supra at 813, in its condemnation of the attorney’s direct intercession with the judge in an attempt to obtain favorable treatment for the second attorney’s client. These facts are wholly incongruous with those before us.

 Specifically, Quirk attacks the court’s decision not to permit a proffered defense witness to testify, the court’s decision to accept into evidence certain documentation of McCarthy’s damages, and the court’s interpretation of §7Nl/4. With respect to the first two arguments, as discussed below, the decision to allow the introduction of particular testimony or other evidence is a matter within the trial court’s discretion. Here, the record does not indicate the purpose for which the precluded defense witness was originally offered, or the reason for which he was precluded from testifying. Without that information, we cannot say that the decision excluding the witness amounted to an abuse of discretion. With respect to the interpretation of the relevant statute, we see no basis for Quirk’s insistence that §7Nl/4’s disjunctive reference to defects “which impair [] the safety or use of the vehicle” (emphasis added) necessarily excludes from coverage any defects which impair both the “safety” and “use” of the vehicle. There is neither a rule of statutory construction, nor a policy rationale, for Quirk’s interpretation of that section. We reject that interpretation, and see in it no evidence of bias for, or against, either party in this dispute.

 An “inspector” must be distinguished from an “inspection station.” See 310 C.M.R. 60.02 (defining “inspector,” “inspection station,” and “workstation”); 540 C.M.R. 4.00 (establishing inspection requirements).

 For example, the fact that Carlton was not Nissan-certified; that he used unconventional tools; or that, lacking a Commonwealth-approved emissions testing machine, he was not “star-rated” by the Commonwealth’s inspection-station rating entity.