COMMONWEALTH vs. ISAIAS SEMEDO.

Suffolk. November 6, 2009. - February 4, 2010.

Present: MARSHALL, C.J., COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Homicide. Practice, Criminal,* Required finding, Argument by prosecutor, View, Variance, Opening statement, Instructions to jury, Jury and jurors, Deliberation of jury, Recording of proceedings. *Evidence,* Joint venturer, Jury view. *Jury and Jurors.*

At the trial of an indictment charging murder in the first degree on a theory of felony-murder with armed robbery as the predicate felony, the defendant's conviction as a joint venturer was supported by strong circumstantial evidence that the defendant was at least a participant; and the inferences that the defendant shared the intent to commit the underlying felony and was willing and able to assist in its accomplishment, as well as that the defendant knew his accomplice had a weapon and intentionally assisted the accomplice in committing armed robbery, were fully supported by the evidence. [7-12]

At a murder trial, the judge correctly instructed the jury that they could consider what they saw on a view in examining and evaluating the evidence,

following the prosecutor's improper statement on that subject during clos-
ing argument [12-13]; further, certain statements in the prosecutor's clos-
ing argument, challenged by the defendant as being improper, either sug-
gested reasonable inferences from the evidence [13,14-16] or did not
substantially sway the judgment [14].

In the circumstances of a murder trial, the judge did not abuse his discretion in
declining to give the jury an instruction regarding the asserted inadequacies
of the police investigation. [16]

A codefendant's admission that was presented to a grand jury by the Com-
monwealth did not commit the Commonwealth to present only such evidence
as was consistent with that admission at the defendant's murder trial [16-18];
further, there was no merit to the defendant's contention that the judge erro-
neously charged the jury as to the defendant's culpability as a principal
[18-19].

At a murder trial, the judge did not abuse his discretion under G. L. c. 234,
§ 34, in giving a deadlocked jury a charge to deliberate further by giving
more serious consideration to opposing points of view when the jury sent a
note to the judge stating that they were deadlocked on two of the three
counts against the defendant following nine hours of deliberation, and an
additional note that they remained deadlocked after five to six hours of
further deliberation, where the judge properly determined that deliberation
had not yet been due and thorough. [19-21]

At a murder trial, the judge did not abuse his discretion in determining that a
postverdict inquiry of a juror, who sent a letter to the judge the day follow-
ing the verdicts, was not warranted, where nothing in the letter mandated
inquiry (i.e., none of the juror's complaints constituted an extraneous influ-
ence on the jury, nor did the letter allege bias). [21-24]

This court declined to exercise its power under G. L. c. 278, § 33E, to reduce
a verdict of murder in the first degree or to order a new trial. [24]

INDICTMENTS found and returned in the Superior Court Depart-
ment on June 26, 2001.

The cases were tried before *Kenneth J. Fishman*, J., and a
posttrial motion for an evidentiary hearing, filed on June 7, 2004,
was heard by him.

*Donald A. Harwood* for the defendant.

*Macy Lee*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury in the Su-
perior Court of murder in the first degree on the theory of felony-
murder with armed robbery as the predicate felony. He was also
convicted of armed robbery.[1] Represented by new counsel on
appeal, the defendant claims that there was insufficient evidence

---

[1] The defendant was acquitted of a charge of possession of a firearm without
a license.

to sustain his convictions as a joint venturer; the prosecutor's closing argument was improper in several respects; the judge erred by declining to instruct on the inadequacies of the police work, see *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980); there was an unconstitutional variance between the theory at the grand jury and the evidence at trial; and the judge did not comply with the requirements of G. L. c. 234, § 34, regarding the failure of the jury to agree on a verdict. In addition, the defendant asserts that the judge erred by denying his motion for a voir dire of a juror who had written a postverdict letter to the judge complaining of pressure by other jurors. The defendant requests also that we exercise our extraordinary power under G. L. c. 278, § 33E, to reverse the convictions and order dismissal of the charges or, in the alternative, to grant him a new trial. We reject the defendant's claims, affirm his conviction of murder in the first degree, and decline to exercise our power to grant extraordinary relief pursuant to G. L. c. 278, § 33E.[2]

Because we affirm his conviction of felony-murder, and armed robbery was the predicate felony, we vacate as duplicative his armed robbery conviction and dismiss the underlying indictment. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 275-276 (1998) ("When a murder conviction is based on a felony-murder theory, the underlying felony, whatever it may be, is always a lesser included offense and the conviction for that felony, in addition to the conviction of murder, is duplicative").[3]

1. *Facts and procedural background.* Because the defendant challenges the sufficiency of the evidence, we summarize the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Cannon*, 449 Mass. 462, 467 (2007). We leave certain evidence that is unnecessary for the sufficiency of the evidence analysis for discussion of other issues raised by the defendant. It was the Commonwealth's theory at trial that the defendant

---

[2]The defendant contends also that it was error to deny his motion to suppress evidence seized from a van in which he was a passenger shortly after the murder. The defendant's motion was heard and denied in conjunction with that of his codefendant, Danilo Lopes, and is governed by our decision in *Commonwealth* v. *Lopes*, 455 Mass. 147, 153-161,164-165 (2009), in which we affirmed the denial of the codefendant's motion to suppress.

[3]The armed robbery conviction was placed on file. Nevertheless, the conviction should be vacated and the indictment dismissed. See *Commonwealth* v. *LeBeau*, 451 Mass. 244, 263 n.20 (2008).

and his codefendant, Danilo Lopes, engaged in a joint venture to rob the victim, Jorge Fidalgo, and that, during the course of the robbery, the victim was shot and killed. Because the codefendant Lopes confessed to the killing, he and the defendant were tried separately. The case against the defendant was entirely circumstantial, the Commonwealth relying primarily on descriptions of the perpetrator and the defendant's presence in a van in Brockton approximately one and one-half hours after the murder while apparently in possession of one-half of the proceeds of the robbery.

The victim and his wife owned a convenience store known as Davey's Supermarket, located at the corner of Dudley and Clarence Streets in the Roxbury section of Boston. Each morning, between 9:30 and 10 A.M., the victim would bring the store's receipts to deposit at two banks. Customarily, his wife would wrap the cash by denomination with a brown paper counting band around each packet. The deposits would include checks and government vouchers as well as cash.

On the morning of April 23, 2001, the victim and his wife drove to work at Davey's Supermarket at about 8 A.M. and parked their minivan on Clarence Street. At approximately 9:45 A.M., the victim's wife handed him two bags. The bag for Sovereign Bank contained $4,125 in cash, as recorded on a copy of the deposit slip that the victim's wife retained for the store's records. Checks and government vouchers were also in the bag. A second bag with similar contents was prepared for Citizens Bank. The money was packaged in brown paper counting bands, with the various denominations separated and bound together by the paper counting bands. For example, the one dollar bills were in packets of twenty-five dollars each. The victim left the store to make his deposits.

Minutes before the shooting, Antonio Fidalgo, a cousin of the victim,[4] saw a long brown van[5] parked in front of 47 Clarence Street. The van had tinted windows and a Cape Verdean flag hanging from the interior rear view mirror. The driver was a

---

[4]The victim and his cousin share the same last name. We refer to Jorge Fidalgo as the victim and to Antonio Fidalgo by his full name.

[5]The van is variously described as "brown," "reddish-brown," "maroon," or "red." Depending on the lighting and the predilection of the viewer, the depiction of the van in the photographs in the record would meet any of these descriptions.

skinny-faced, dark-complected man wearing a "Jamaican hat" of the type that "somebody that has . . . dreadlocks" would wear. (A police sergeant described a "Jamaican hat" as one that is green, red, and yellow.) Antonio Fidalgo saw a second person moving in the back seat area of the van but was unable to describe this individual. Antonio Fidalgo did an errand on Clarence Street, and fifteen minutes later, he discovered the victim slumped in the seat of his minivan. The long brown van was no longer on Clarence Street.

The police responded to a 911 call and found the victim in his minivan with a gunshot wound behind his left ear.[6] The vehicle was stopped in the middle of the street in front of 47 Clarence Street with its engine still running. Only the bag containing the deposit for Citizens Bank was found in the vehicle. The second bag containing the money and other items for deposit at Sovereign Bank was not present.

Antonio Fidalgo reported to the police his observations of the long brown van and its occupants. Based on police information that a large Cape Verdean population resides in the Brockton area, the Boston police notified the Brockton police of the information provided by Antonio Fidalgo. At about 11:15 or 11:20 A.M., approximately one and one-half hours after the victim had been shot, a Brockton school police officer working a road detail in Brockton heard a police radio broadcast that a brown van with tinted windows and a Cape Verdean flag was wanted in connection with a Boston homicide. The officer saw such a vehicle stopped next to him in traffic; he radioed for assistance, and other officers arrived.

An officer approached the driver and inquired whether he had just come from Boston. When the driver, later identified as Lopes, responded affirmatively, he and the defendant were ordered out of the van, handcuffed, and pat frisked for weapons. No weapons were discovered.

Two officers entered the van. The first officer went into the van to retrieve Lopes's identification after Lopes indicated that his license was in the van. The second officer entered to ascertain that no one else was in the vehicle. The officers discovered two

---

[6]The victim was transported to the hospital and died of the gunshot wound later that day.

articles of clothing in the rear of the van: a denim vest (described also as a coat) and a gray velour jacket. A wallet containing Lopes's driver's license was retrieved from a pocket of the vest. In the gray velour jacket, the police observed a "large sum of money," "maybe an . . . inch and a half thick." This money was later determined to be $2,006 in cash, and some of it was wrapped in brown paper counting bands of the type used by the victim's wife to wrap the deposits.[7]

At this point, the handcuffs were removed from the two men, and they were asked if they would agree to wait for Boston detectives to arrive to question them. They agreed to do so. The Boston police arrived, accompanied by Antonio Fidalgo, who identified the van as the one he had seen parked in front of 47 Clarence Street just before his cousin was shot. Antonio Fidalgo did not, however, identify either of the individuals as the driver or passenger of the van. He did observe that the defendant had dreadlocks. The van was impounded and towed by the police. Neither of the two men was arrested. They remained free until two days later.

Pursuant to a search warrant, the Boston police searched the impounded van. The search warrant authorized the police to seize the items they had earlier observed in the van, i.e., the denim vest, the gray velour jacket, and the $2,006 in cash originally found in the gray jacket. Two Minute Maid orange drink bottles were also found in the van. No fingerprints of either Lopes or the defendant were found on the inside of the van.

The van had been loaned to Lopes for the day by an acquaintance, Lionel Goncalves. By prearrangement, Lopes, unaccompanied, picked up the van at 7 A.M. on April 23, 2001, and drove Goncalves to work at about 7:30 A.M. None of the above-described items later found in the van belonged to Goncalves or were in the van when he loaned it to Lopes.

On April 25, 2001, Lopes, who had not yet been arrested, gave the police $2,000 in cash.[8]

The police located a white Nissan 240SX automobile parked on Otis Street around the corner from the scene of the shooting.

---

[7]In addition, $175 was later taken from Lopes at the police station. Of the $175, twenty-five one dollar bills were wrapped in a similar brown paper counting band.

[8]The record does not explain the source of this money or any information

The automobile belonged to Simone Hutcheon. On April 25, 2001, two days after the murder, the defendant was arrested at a home in Meriden, Connecticut, where Simone Hutcheon was present.[9] The defendant was photographed on the day of his arrest, and he was wearing dreadlocks. He also has a thin face and is dark-complected.

The sales manager of an automobile parts store in Brockton was familiar with the defendant as a regular customer of his store. Ordinarily, when the defendant came into the store he was wearing a green, red, and orange knit hat over his dreadlocks. On the day of the murder, the defendant, accompanied by a second man, entered the store sometime after 10 A.M. The defendant was wearing dreadlocks, a green, red, and orange hat, and a dark jacket. The men had a bag with them, "like a duffle bag." They bought drinks from a dispenser that sold Minute Maid orange drinks and went out back for a short time. They did no business in the store and left.

Pursuant to a search warrant, the police located a .38 caliber revolver hidden under a dog house at a residence in Brockton.[10] The weapon was operable, and comparison testing revealed that it was the weapon that fired the bullet recovered from the victim's body.

2. *Sufficiency of the evidence.* The defendant claims that there was insufficient evidence to convict him as a joint venturer. He moved for a required finding of not guilty on all the indictments at the close of the Commonwealth's evidence and again at the close of all the evidence. In reviewing the denial of a motion for a required finding, we consider "whether the evidence, in its light most favorable to the Commonwealth, . . . is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged." *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth*

---

about it. Evidence regarding the money received from Lopes is probative because the total of all the money recovered from Lopes and the defendant equals approximately $4,000, and $4,125 was taken from the victim. See part 2, *infra*.

[9]There is no explanation regarding how the defendant, who had not been arrested on the day of the murder, was located in Connecticut.

[10]There was no objection to the admission of evidence that the gun was discovered in Brockton.

v. *Sandler*, 368 Mass. 729, 740 (1975). "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore, supra* at 677, quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). In this analysis we do not weigh the supporting evidence against conflicting evidence, nor do we consider the credibility of the witnesses. *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005). *Commonwealth* v. *Lydon*, 413 Mass. 309, 311 (1992). The Commonwealth may rely on circumstantial evidence. *Commonwealth* v. *Degro*, 432 Mass. 319, 325 (2000). In viewing the evidence, the inferences we draw need only be "reasonable and possible," rather than necessary. *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980).

Because the defendant moved for required findings at the close of the Commonwealth's case, and again at the close of all the evidence, "[w]e consider the state of the evidence at the close of the Commonwealth's case to determine whether the defendant's motion should have been granted at that time. We also consider the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case." *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984).

As stated, the Commonwealth proceeded against the defendant on a joint venture theory. A joint venturer is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). "The elements of the [crime] . . . are not determined or influenced by whether the defendant was the sole perpetrator or only one of several participants in the crime[]. [As long as] [t]he evidence was sufficient to show that the defendant was at least a participant, even if he was not the sole perpetrator, and that he possessed the state of mind required for guilt[, n]othing further [is] required for conviction." *Commonwealth* v. *Dyer*, 389 Mass. 677, 683 (1983). The Commonwealth need not prove "the precise conduct of each [individual] if there [is] evidence that a [homicide] took place." *Commonwealth* v. *Bianco*, 388 Mass. 358, 367 (1983). "Direct evidence of who shot the victim[]

'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] [killed]' the victim[]." *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994), quoting *Commonwealth* v. *Cohen*, 412 Mass. 375, 381 (1992). See also *Commonwealth* v. *Casale, supra* at 174.

The evidence and the reasonable inferences drawn therefrom were sufficient to warrant a finding that the defendant was guilty of murder on a theory of felony-murder. Various pieces of evidence link the defendant to the murder. The jury could find that the brown van stopped by the police in Brockton at approximately 11:15 A.M. on April 23, 2001, a long, fifteen-passenger van, was the same van that Antonio Fidalgo observed parked on Clarence Street shortly before the shooting. There is no question that the defendant was a passenger in that van when it was stopped in Brockton. The issue is whether the evidence supports the inference that he was in the van on Clarence Street and that he participated in the murder of the victim.

Admittedly, there was no direct evidence that the defendant was involved. He is connected to the killing, however, by evidence of his physical appearance, the money found in a jacket in the van when it was stopped, the time line of events on the day of the murder, and the white Nissan 240SX automobile found near the murder scene. Minutes before the murder, Antonio Fidalgo saw a skinny-faced and dark-complected man in the driver's seat of the van parked at 47 Clarence Street. The man was wearing a "Jamaican hat" of the type that people with dreadlocks often wear. A "Jamaican hat" was described as one that is green, red, and yellow. The sales manager of the automobile parts store in Brockton testified that when the defendant came in to his store, he had dreadlocks and usually wore a green, red, and orange hat. Similarly, when the defendant visited that store on April 23, 2001, he had dreadlocks and was wearing a green, red, and orange hat. He was also wearing a dark jacket. The defendant had dreadlocks when he was stopped in the van in Brockton approximately one and one-half hours after the murder, and was wearing his hair in dreadlocks when he was arrested two days later. A picture of the defendant taken at the time of his arrest depicts him as a person with a thin face and dark complexion. Thus, the physical characteristics of the defendant and his clothing, in particular the presence of a "Jamaican hat," match the description of the man

who was in the driver's seat of the van on Clarence Street just before the murder.

Additional support for the inference that the defendant was in the van at the time of the murder is provided by the money involved. Missing from the victim's minivan was the deposit bag for Sovereign Bank, which contained $4,125 in cash. At the time the van was stopped, two outer garments were found in the van, a denim vest and a gray velour jacket. The denim vest contained the wallet and identification of Lopes, one of the occupants of the van. Since the vest apparently belonged to Lopes, and neither item of clothing was in the van when Lopes picked it up at 7:30 A.M., it is reasonable to infer that the gray velour jacket belonged to the defendant.[11] In a pocket of that jacket was found $2,006 in cash. Some of that money was wrapped in brown paper counting bands of the type used by the victim's wife to wrap the money for deposit. Two thousand six dollars also equals roughly one-half of the proceeds of the robbery. Lopes, the other person in the van, turned over to the police two days later $2,000 in cash, some of it wrapped in brown paper counting bands.[12] The jury could reasonably reject as an improbable coincidence the notion that the occupants of the van obtained cash in those particular amounts and with those particular counting bands from sources other than the Clarence Street robbery.

The time line of the events on the day of the murder also supports the inference that the defendant was in the van at the time of the murder. The victim was killed at approximately 9:45 A.M. (He left his store after 9:30 A.M., and at 9:40 A.M. the crime had not yet taken place; the police received a report of the shooting at approximately 9:50 or 9:55 A.M.) Lopes and the defendant were stopped in the van in Brockton at 11:15 or 11:20 A.M., approximately one and one-half hours later. Although there was no testimony concerning the length of time it takes to drive from the Roxbury section of Boston to Brockton at that time of day, during a view the jury had traveled that route on a bus. Information

---

[11]We have examined the jacket. The jury could permissibly credit the testimony of the sales manager of the automobile parts store that the jacket was dark in color. See supra.

[12]The police also obtained from Lopes $175 at the police station on the day of the murder. Twenty-five one dollar bills of this $175 were wrapped in a brown paper counting band. The total of all the money recovered equals approximately $4,000.

garnered on a view "may be used by the jury in reaching their verdict, [although] in a 'strict and narrow sense, a view may be thought not to be evidence.' " *Commonwealth* v. *Curry*, 368 Mass. 195, 198 (1975), quoting *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 30 (1923). There was evidence that the defendant and another man stopped at the automobile parts store in Brockton at some time after 10 A.M., before they were stopped by the police. While at the store, the two men bought drinks from a vending machine that sold Minute Maid orange drinks. Two orange drink bottles were subsequently found in the van, thus permitting an inference that the defendant was with Lopes at least from the time that they appeared at the parts shop until they were stopped by the police.

Further warranting the inference that the defendant was in the van at the time of the murder is that a white Nissan 240SX automobile registered to Simone Hutcheon was found around the corner from the scene of the shooting. The defendant was arrested at a residence in Meriden, Connecticut, and Simone Hutcheon and a child were there with him. From this evidence and from the fact that Lopes was alone when he borrowed the van from Goncalves, but that two people were in the van when Antonio Fidalgo saw it, it is reasonable to infer that the defendant drove to the scene of the crime in Hutcheon's automobile and met Lopes there.

Having determined that the evidence supports a finding that the defendant was in the van at the time of the murder, we must also consider whether there was sufficient evidence that the defendant shared the intent to commit the robbery and was willing and able to assist in its accomplishment. *Commonwealth* v. *Bianco, supra* at 366. Because the possession of a dangerous weapon is an element of armed robbery, see *Commonwealth* v. *Tevlin*, 433 Mass. 305, 310 (2001), the Commonwealth must prove that the defendant knew that his accomplice had a weapon and that the defendant intentionally assisted that accomplice in the commission of the armed robbery while sharing the mental state required for that crime. See Model Jury Instructions on Homicide 64 (1999).

The victim was shot while in his vehicle with the motor running. Because there was evidence that the perpetrators effectuated the robbery while the vehicle was operating, the jury could reasonably conclude that a firearm or other dangerous weapon had to be

employed and that the defendant was aware of it. From the evidence that one-half of the proceeds of the robbery was in a jacket which by inference belonged to the defendant, a finding is warranted that the defendant assisted in the commission of the robbery while sharing the requisite mental state.[13],[14]

3. *Closing argument.* The defendant contends that the prosecutor made statements in closing argument that were unsupported by the evidence. "A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." *Commonwealth* v. *Pearce*, 427 Mass. 642, 646 (1998), quoting *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994). Defense counsel objected to certain of the remarks but not to others. We consider first the statements to which the defendant objected and, if there were improper comments, apply a prejudicial error standard. That is, we must determine whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). "The essential question is whether the error had, or might have had, an effect on the jury and whether the error contributed or might have contributed to the verdicts." *Commonwealth* v. *Grimshaw*, 412 Mass. 505, 508-509 (1992), quoting *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990).

a. *Statements objected to.* (i) The defendant maintains that the prosecutor argued improperly that the jury could rely on their experience in driving from Boston to Brockton during a view to estimate the amount of time that elapsed between the robbery and murder and the stopping of the vehicle by the police. At the

---

[13]The Commonwealth's case did not deteriorate during the presentation of the defendant's case.

[14]In a letter submitted pursuant to Mass. R. A. P. 16 (l), as amended, 386 Mass. 1247 (1982), the defendant makes an argument unrelated to any of those raised in his brief or reply brief. He "objects" to the introduction of testimony of a medical examiner other than the one who performed the autopsy. The defendant claims that such testimony was admitted in violation of *Crawford* v. *Washington*, 541 U.S. 36 (2004), and *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009). There was no error. See *Commonwealth* v. *Avila*, 454 Mass. 744, 759-766 (2009) (right of confrontation not violated where medical examiner who did not perform autopsy testifies to his own opinion as to cause of death).

close of the argument, the defendant objected to this remark and, in response, the judge thereupon instructed the jury not to consider as part of the evidence "the amount of time that it took to drive from Boston to Brockton, when we took our view, that is not evidence in this case. And in terms of your determination of the facts, you should disregard that argument." In his final instructions to the jury, however, the judge stated that "[t]he view is part of this case, and you may consider what you saw on the view as you examine and evaluate the evidence in this case." The judge's second instruction was correct. As we have stated, information obtained on a view is not evidence "in a strict and narrow sense," but may be used by the jury in reaching a verdict. *Commonwealth* v. *Curry*, *supra*. There was evidence that the defendant was present in Boston and then drove to Brockton. The jury, having taken such a ride on the view, could apply its general understanding of the time such a trip requires. (To the extent the two instructions were inconsistent, the one the jury heard last was correct, and the defendant received more than he was due from the earlier instruction.)

(ii) The defendant argues that the prosecutor's suggestion, reprinted in the margin,[15] that the defendant "had interaction with [the victim]" lacked evidentiary support. That there was the likelihood of contact between the defendant and the victim at the store is a reasonable inference, and the prosecutor's reference to the inference was within the bounds of proper argument. In closing argument, a prosecutor may analyze the evidence and suggest reasonable inferences the jury should draw from that evidence. *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 553 (1990). There was evidence that the victim worked full time at the store. The victim's wife testified that the defendant was in the store periodically, including at the rear of the store where the beer was sold. She testified also that her husband sometimes carried heavy items to the defendant's car.

---

[15]The text of the challenged statement is as follows:

"They each independently have a connection to that store. [The victim's wife] told you that the defendant is somebody that used to come into that store and bring cash to the store, and take items from the grocery store back to another customer. What does that mean; that means that he was in the rear of the store where beer was being sold, directly under the office window, *and had interaction with [the victim]*" (emphasis added).

(iii) The next portion of the argument to which the defendant objected, reprinted in the margin,[16] concerns the defendant's knowledge of the victim's routine of making daily deposits. The prosecutor's statement that he had no knowledge whether the defendant knew that the victim went to the bank each morning, if taken literally, insinuated into the process what the prosecutor did or did not know, and as such was improper. *Commonwealth v. Thomas*, 401 Mass. 109, 115-116 (1987). We conclude, however, that the statement was a rhetorical device intended to communicate accurately to the jury that there was no direct evidence of the defendant's knowledge of the banking routine. Nevertheless, in arguing that the jury could assume knowledge on the part of the defendant, the prosecutor sought to draw an inference that does not flow logically from the evidence. Even so, we are satisfied that the argument could not have "substantially swayed" the judgment. *Commonwealth v. Flebotte, supra.* See *Commonwealth v. Pope*, 406 Mass. 581, 587-588 (1990).

(iv) The defendant claims that the prosecutor argued without evidentiary support that the defendant and Lopes "split" the money from the robbery in the rear of the automobile parts store in Brockton. In this regard, the prosecutor stated that the defendant was familiar with the store and that there were fifteen acres of cars there, "[f]ifteen acres of places to split things up. Now do I know, does the Commonwealth know or does anyone know whether that's where they split it up? No. But they sure were in a position to. They didn't buy anything. They didn't come back in with parts from autos, and in fact what they did was walk in with a bag." The statement was improper. Passing the repetition of the prosecutor's equation of what he knows with a question of evidence, see *supra*, there was no evidentiary support for the proposition that the two men divided the proceeds of the robbery in back of the store. Nonetheless, the evidence certainly permitted the inference that, sometime before the van was stopped, the defendant and Lopes divided the money between them, see part

---

[16]"Now did [the defendant] know that [the victim] went to the bank every morning, I don't know the answer. He sure was in a position to. Danilo Lopes is the son of the man of one of [the victim's] best friends [*sic*]. He had a connection to [the victim], and he had a connection with 438 Dudley Street, Davey's Market."

2, *supra*; whether they did so at the automobile parts store or elsewhere was not material. *Commonwealth* v. *Flebotte, supra*.[17]

(v) The defendant attacks the prosecutor's characterization of the crime as a "two-person operation." The challenged statement is as follows: "What about the nature of the crime itself . . . . Two people had to be involved. One had to take the money, and one had to drive the van. This was a two person operation. It wasn't a one person operation. It was a two person operation." This statement asked the jury to draw a reasonable inference from the evidence.

(vi) The defendant criticizes the statement that he must have been aware that Lopes had a gun because the victim's car was stopped in the middle of the street and money was taken. As discussed, see part 2, *supra*, the suggested inference was reasonable from the evidence. Even if the victim knew Lopes, a weapon would presumably have been necessary to take the money from the victim when he was sitting in a vehicle with the engine running.

(vii) Finally, there was objection to the prosecutor's argument that certain items which were not recovered (a Sovereign Bank bag, a "Jamaican hat," and Davey's Supermarket checks) had been discarded by the defendant and Lopes. There was evidence that these two men had robbed the victim and that these items were involved in the crime, but they were not found in the van when it was stopped; thus there was support for this segment of the closing argument.

b. *Statements not objected to*. The defendant claims that other parts of the closing to which no objection was made were improper. Because there was no objection to these portions, our inquiry is confined to determining whether these statements were improper, and, if so, whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991), and cases cited.

(i) The defendant contends that the prosecutor improperly argued that the defendant and Lopes were at the crime scene in Boston, that Lopes was the man with the defendant at the automobile parts store in Brockton, and that the gray velour jacket containing $2,006 found in the van belonged to the defendant.

---

[17]In addition, the jury were instructed that the closing arguments were not evidence and that they could consider only the evidence in the case.

As discussed in part 2, *supra*, each of these statements was supported by the evidence and the reasonable inferences therefrom.

(ii) The defendant next claims that the prosecutor should not have suggested that Lopes and the defendant buried the murder weapon at 74 Otis Street in Brockton, an address not connected to either man. There was evidence, admitted without objection, that the police, acting pursuant to a search warrant, located a .38 caliber revolver hidden under a dog house in the rear of a house at 74 Otis Street in Brockton and that that firearm was the murder weapon. The prosecutor conceded that no evidence linked either Lopes or the defendant to the residence at 74 Otis Street. He began and ended the discussion of this subject by stating that "no one saw them at 74 Otis Street. He's right. Nobody saw them at 74 Otis Street." It is obvious that the perpetrators, whoever they were, disposed of the murder weapon. The fact that the gun was found hidden in Brockton, a place connected to the defendant, rather than in a place with no relation to the defendant, is consistent with the theory that the defendant was a perpetrator. The argument was not improper.

4. *Jury instructions.* The defendant contends that the judge should have instructed the jury that, in their analysis of the evidence, they could consider the police failure to preserve notes, to investigate fully, and to conduct certain tests. See *Commonwealth v. Bowden*, 379 Mass. 472, 485-486 (1980). The defendant refers specifically to police failure to test the gray velour jacket in which the $2,006 was found; failure to test four white cotton gloves found in the van which contained hair fibers; and failure to trace ownership of the murder weapon. The defendant has not provided any specifics regarding what he means by the police failure to preserve notes or to investigate "fully." In any event, as the defendant concedes, whether to give such an instruction is within the judge's discretion. *Commonwealth v. Hardy*, 431 Mass. 387, 395 (2000). *Commonwealth v. Rivera*, 424 Mass. 266, 274 (1997). We have never required that a judge do so. See *Commonwealth v. Hardy*, *supra*. Failure of the authorities to preserve material or to conduct tests is a permissible ground of defense, and the defendant was allowed to argue the issue. There was no abuse of discretion in declining to give the instruction.

5. *Variance.* Armed with largely irrelevant authorities to the

effect that defendants in criminal trials are entitled to due process, the defendant asserts that his "due process rights were violated because an unconstitutional variance occurred in the proof at trial." To the extent that we understand the argument, we believe that the defendant employs the term "variance" incorrectly. The term "variance" generally refers to a difference between an indictment and the proof at trial. See G. L. c. 277, § 35, which provides that a variance shall not require acquittal if the essential elements of the crime have been correctly stated in the charge and the defendant has not been prejudiced. What is at issue is the right of a defendant to be informed accurately of the charge against him or her. See *United States* v. *Bailey*, 444 U.S. 394, 414 (1980).

Here, the defendant does not challenge the indictments themselves. Charges of murder and armed robbery clearly communicate to a defendant the offenses alleged. What the defendant argues instead is that the prosecutor presented to the grand jury evidence that the defendant committed the charged offenses as a joint venturer, but then tried the case so as to permit the jury to convict him as a principal. In addition, he claims that the judge's instructions erroneously permitted the jury to convict on the theory that he was the principal when there was no evidence to that effect. The contention that the defendant was charged as a joint venturer but then convicted as a principal has no merit. The defendant relies on the fact that the prosecutor presented to the grand jury a confession of the codefendant Lopes in which Lopes admitted to shooting the victim. From this, the defendant argues in essence that the Commonwealth thereby committed itself to the proposition that Lopes was the principal in the joint venture and that the defendant could only be tried as an accessory.

The short answer to this is that the presentation of Lopes's out-of-court statement that he shot the victim committed the Commonwealth to nothing other than the fact that Lopes had made such a statement. The grand jury were not required to believe the statement. They could believe it, accept it only as evidence that Lopes was present and participated in some way, or disregard it altogether. Assuming that the evidence before the grand jury was sufficient to satisfy the standard of probable cause to believe the defendant had committed the crimes charged, see

*Commonwealth* v. *McCarthy*, 385 Mass. 160, 162-163 (1982), the resulting indictments of the defendant for murder and armed robbery were valid. They are not restricted by a specific piece of evidence that may have had no effect on the decision to indict.

Based on the erroneous assumption that the statement of Lopes, which was before the grand jury, in some way limited the Commonwealth's presentation at trial, the defendant charges as improper the prosecutor's opening statement that no one knew who pulled the trigger (thus suggesting the possibility that, contrary to Lopes's statement, the defendant might have done so). The prosecutor's statement was accurate. While the evidence supported a finding that Lopes and the defendant engaged in a joint venture to commit an armed robbery and that a homicide ensued, there was no evidence as to the role of each joint venturer. Nor was such evidence necessary. The Commonwealth need not prove "the precise conduct of each [participant] if there [is] evidence that a [homicide] took place." *Commonwealth* v. *Bianco*, 388 Mass. 358, 367 (1983). See *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994) (direct evidence of who shot victim not required where there was strong circumstantial evidence that one or other of assailants was responsible).

The defendant's argument in this regard suggests the existence of judicial estoppel because, he claims, the prosecutor, having presented Lopes's confession to the grand jury, was required to present at trial only such evidence as was consistent with that admission. We have described the principle of judicial estoppel as one applicable where "[a] party who has successfully maintained a certain position at a trial cannot in a subsequent trial between the same parties be permitted to assume a position relative to the same subject that is directly contrary to that taken at the first trial." *Commonwealth* v. *Prophete*, 443 Mass. 548, 555 n.10 (2005), quoting *East Cambridge Sav. Bank* v. *Wheeler*, 422 Mass. 621, 623 (1996). That is not what occurred here. Not only did the Commonwealth not prevail in a prior proceeding on a theory that Lopes was the principal, it did not seek to portray the defendant as the principal in the present case. Indeed, it presented no evidence other than that the two men undertook the armed robbery together. Our decision in *Commonwealth* v. *Zanetti*, 454 Mass. 449 (2009), may, in any event, render these distinctions less meaningful.

Finally, the defendant accuses the judge of a related error,

specifically, that he charged the jury on principal liability when there was no evidence that the defendant was a principal. No portion of the judge's charge suggests that the jury could convict the defendant as a principal. The defendant points only to the fact that the judge instructed the jury on the elements of armed robbery. The judge was required to do so in explaining the Commonwealth's burden of proof on the charge of murder in the first degree on a theory of felony-murder. See Model Jury Instructions on Homicide 15-16 (1999). That explanation did not suggest whether the defendant may have acted as principal or as joint venturer. The jury were instructed twice specifically that the Commonwealth was proceeding against the defendant on a joint venture theory. They were not given the option to consider his liability as a principal. See *Commonwealth* v. *Rolon*, 438 Mass. 808, 817 n.10 (2003).[18]

6. *Jury deliberations.* The defendant argues that there must be a new trial because the judge did not follow the requirements of G. L. c. 234, § 34. The statute provides:

> "If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

The determination as to when the jury's deliberations have been "due and thorough" lies within the discretion of the judge, see *Commonwealth* v. *Haley*, 413 Mass. 770, 779 (1992), and requires evaluation of the "complexity of the case, the extent of evidentiary conflict on material issues, and the total length of time the jury [have] spent attempting to resolve those conflicts." *Commonwealth* v. *Winbush*, 14 Mass. App. Ct. 680, 682 (1982), citing *Thames* v. *Commonwealth*, 365 Mass. 477 (1974).

---

[18]The defendant claims that the verdict must be set aside because the jury were not asked to identify whether they convicted the defendant of felony-murder under a theory that he was a joint venturer or under a theory that he was a principal, which lacked a sufficient evidentiary basis. As indicated, the jury were not given this choice.

On Monday, April 26, 2004, after the jury had been deliberating for approximately nine hours,[19] they sent the judge a note stating that they had reached a unanimous decision on the charge of possession of a firearm, but were deadlocked on the remaining two charges.[20] Later that afternoon, after an additional five to six hours of deliberations, the judge received a second note indicating that the jurors were "still deadlocked," and that, "[a]lthough ten jurors have reached the same decision, two jurors stated that no amount of further deliberations will change their minds." The judge denied the defendant's request for a mistrial, and, because it was almost 5 P.M., suspended deliberations until the following morning.

At that time, defense counsel argued that, because the jury had previously reported that they were deadlocked, two reports of deadlock had been received, and the judge should declare a mistrial. The judge disagreed, finding that "in the context of this case . . . a jury that had deliberated . . . at most nine hours and perhaps less [at the time of the first report of deadlock] had not yet reached the point of due and thorough deliberation." Accordingly, after receipt of the second indication of deadlock, he gave the *Tuey-Rodriquez* charge, an instruction designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view. See *Commonwealth* v. *Rodriquez,* 364

[19]Although the briefs of the parties offer conflicting calculations of the deliberating time, the judge at one point characterized the time as nine hours. We take that as a finding and adopt it. While it is not expressed in the record, we take notice of the fact that juries generally do not deliberate during lunch breaks and are not permitted to deliberate when a juror is taking a cigarette break. Times during which the judge is considering a note must be deducted from deliberating time as well. The transcript does not indicate the time when proceedings began or suspended each day. Such information is useful and should be included.

[20]Although the note was marked as an exhibit, there is no contemporaneous record of a lobby conference held in response to the note. Later recorded discussions, however, reference such a lobby conference; the transcript indicates that there was an unrecorded lobby conference prior to the giving of the so-called *Tuey-Rodriquez* charge. See *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 102-103 (1973) (Appendix B); *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-3 (1851). We repeat what we have stated before. Unrecorded lobby conferences are to be avoided. See, e.g., *Commonwealth* v. *Serino,* 436 Mass. 408, 412 n.2 (2002). This is particularly true in a case of murder in the first degree where we are required to review the entire record of the case. See G. L. c. 278, § 33E.

Mass. 87, 98-101 (1973), modifying *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-4 (1851). Later that day, the jury reported that it had reached a unanimous verdict on two of the three charges. The following day, Wednesday, April 28, the jury requested further instruction on joint venture. Later that day, the jury returned the verdicts.

The defendant suggests that, after the first report of a deadlock received on the morning of Monday, April 26, a *Tuey-Rodriquez* charge would have been appropriate. He maintains that the length of deliberations indicated that by then they had been "due and thorough." This is of significance because, had the jury been so instructed at that time, the second report of deadlock submitted later that afternoon would have precluded the judge from demanding further deliberation without the jury's consent. See G. L. c. 234, § 34.

We conclude that the judge acted within his discretion in this regard. Twenty witnesses testified at trial; the evidence took five days to present, but the facts of the case were not simple. In addition, there were sixty-five exhibits. As is obvious from the discussion above, whether there was proof beyond a reasonable doubt that the defendant participated in a joint venture was a complex question, requiring analysis of inferences and considerations of numerous factors. "[W]e think it was open to the judge to determine . . . that deliberation had not yet been 'due and thorough' . . . ." *Commonwealth* v. *Valliere*, 366 Mass. 479, 496 (1974) (in complex trial with seventy-eight witnesses and over 250 exhibits, judge could permissibly determine that deliberations had not been "due and thorough" after thirteen hours).

7. *Juror note.* The day after the verdict, one of the deliberating jurors sent a letter (reprinted in the Appendix) to the judge. The letter suggests that its author and one other juror voted to convict despite the fact that each had reasonable doubt concerning the defendant's guilt. According to the writer, the two jurors voted guilty because they "did not want to endure any more verbal abuse." The letter states that other jurors ignored the judge's instructions and the presumption of innocence. One juror is quoted as saying, "Even if we don't have the evidence, the grand jury must have had enough evidence of his guilt or we wouldn't be here." The letter also discusses other aspects of the

deliberations that its author claims illustrate juror confusion and failure to work cooperatively.

After the letter had been shared with counsel and the Commonwealth, the judge held a hearing on defense counsel's motion to conduct a voir dire of the author of the letter. The judge denied the request on the ground that none of the juror's complaints "constitutes an extraneous influence on the jury" but rather concerned the jury's internal deliberations, which are not to be made subject to posttrial scrutiny. See *Commonwealth* v. *Fidler*, 377 Mass. 192, 197 (1979) (*Fidler*). The judge also concluded that the letter contained no allegation of bias. See *Commonwealth* v. *Laguer*, 410 Mass. 89, 97-99 (1991).

The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a criminal defendant the right to a trial by an impartial jury. The presence of even one partial juror violates this right. See *Commonwealth* v. *Vann Long*, 419 Mass. 798, 802 (1995). The defendant argues that a voir dire was necessary to ensure that he received a fair trial. A trial judge has broad discretion in determining whether a postverdict inquiry of a juror is warranted. *Commonwealth* v. *Dixon*, 395 Mass. 149, 151-152 (1985), and the judge here did not abuse that discretion.

In *Fidler, supra* at 196, we made clear that "our rule does not create an absolute prohibition against juror testimony to impeach a verdict [and that] . . . juror testimony is admissible to establish the existence of an improper influence on the jury, but is not admissible to show the role which the improper influence played in the jury's decision." Our rule "does not permit evidence concerning the subjective mental processes of jurors, such as the reasons for their decisions." *Id.* at 198. We take evidence of alleged acts of misconduct only "where overt factors are present by which the verdict's validity can be objectively assessed . . . ." *Id.,* quoting 3 J. Weinstein & M. Berger, Evidence par. 606[03], at 606-625 (1978). In *Fidler,* we authorized postverdict inquiry of jurors only in limited circumstances. A judge is not under a "duty to investigate . . . unless . . . [there is] some suggestion or showing that extraneous matters were brought into the jury's deliberations." *Commonwealth* v. *Dixon, supra* at 151.

Cases in which postverdict inquiry was proper have been

narrowly limited. In *Fidler, supra* at 194, an affidavit signed by a juror stated specifically that another juror introduced into the deliberations information extraneous to the trial that the defendant had been involved in a shooting incident that had not been mentioned in trial evidence. In *Commonwealth* v. *Dixon, supra* at 150, an affidavit signed by defendant's counsel related a telephone conversation between himself and a man who identified himself as a juror. The man stated that there had been out-of-court conversations with witnesses in the case that were made known to another juror. In *Commonwealth* v. *Guisti*, 434 Mass. 245, 249-250 (2001), a juror had posted a notice midtrial on an Internet mail service stating that she was "stuck in" a rape case and had more important things to do and that the jurors should just vote guilty and "get on with our lives." According to the defendant, approximately 900 people subscribed to this mailing list and would have received the juror's message. *Id.* at 250. Although we said that the woman's original statement did not require any inquiry, we concluded that, because the juror may have received responses to her electronic mail posting, the juror "left herself vulnerable to receiving information about the case" before a verdict was reached. *Id.* at 252-253. See *Commonwealth* v. *Guisti*, 449 Mass. 1018 (2007). In each of these cases, we concluded that hearings were required to determine whether improper external influences had tainted the validity of the verdicts.

Unlike these cases, the present case does not contain any possibly extraneous influence. The letter before the judge here mentioned in general terms the juror's personal opinions about deliberations and the process of those deliberations. She said that she and one other juror had been pressured into voting guilty because other jurors had become "angry and impatient," that jurors "suppose[d] a fact and cl[u]ng to it," that there was "hostility" in the jury room, and that "she did not have the strength of character to stand [her] ground." None of these allegations or the others in the letter constituted an extraneous influence on the jury. "Tension between jurors favoring guilt and those favoring acquittal is part and parcel of the internal decision-making process of jury deliberations." *Commonwealth* v. *Mahoney*, 406 Mass. 843, 855 (1990). Nothing in the juror's letter mandated an inquiry.

Indeed, in the *Mahoney* case, the trial judge received a letter

quite similar to the one here, and this court criticized him soundly for holding a juror voir dire. *Id.* at 853, 855-856. In that case, the judge received a postverdict letter from a juror questioning whether other jurors followed the judge's instructions and suggesting that the jurors did not confine their deliberations to the evidence. *Id.* at 853. The judge held a voir dire and we said, "There was nothing in the juror's letter which necessitated an inquiry. After hearing counsel, the judge should have denied the motion before him. Nevertheless, he pressed ahead with an unnecessary interview." *Id.* at 855.

We stated further in the *Mahoney* case that the interview revealed "(1) that some jurors had discussed the merits of the case prior to the commencement of deliberations; (2) that the juror felt that she, and at least one other juror, had been 'pressured' and 'badger[ed]' into finding guilt because the jurors who concluded the defendants had been proved guilty 'were very stubborn' and '[t]hey weren't going to change their minds no matter what we had to show them[;]' and (3) that some jurors were concerned about 'get[ting the defendants] off the street' so they would not commit other crimes." *Id.* We held that "[n]one of these constituted an extraneous influence on the jury." *Id.* The juror's letter in the present case presents even less than was revealed after the interview in the *Mahoney* case. As in the *Mahoney* case, there were no extraneous influences here and no "disturbing influence" of an extraneous matter. *Fidler, supra* at 199.

8. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record and discern no reason to order a new trial or reduce the defendant's murder conviction to a lesser degree of guilt.

9. *Conclusion.* The judgment of murder in the first degree on a theory of felony-murder, with armed robbery as the predicate felony, is affirmed. The judgment and sentence on the indictment charging armed robbery are vacated as duplicative, and that indictment is remanded to the Superior Court for dismissal.

*So ordered.*

APPENDIX.

The letter from a juror:

"I hope it is not improper for me to write to you concerning my recent experience on a jury in your courtroom. I was a member of the jury in the criminal case against Isaias Semedo, who was found guilty on [April 28, 2004,] of murder-felony and armed robbery.

"Two jurors (including me) voted for a guilty verdict despite our reasonable doubt, only because the rest of the jury had become so angry and impatient that we saw no further possibility of constructive discourse and frankly did not want to endure any more verbal abuse. The discussion had deteriorated to personal attacks against us rather than debate over evidence, logic, and our instructions on the law. The prevailing mood was that the jurors in the minority must be convinced to change their minds, while those in the majority were entitled to their certainty and need not consider changing their minds. The foreperson actually suggested to one dissenter that perhaps she was unable to serve on a jury and would she would like to be excused — this because the juror stayed quiet for most of the discussion but when straw polls were taken, she consistently expressed her doubt.

"Because I wanted to emphasize the instructions on presumption of innocence and the definition of reasonable doubt, I was told, 'You're getting too stuck on the letter of the law.' I could only conclude from comments made by several jurors that they were operating under a presumption of guilt until proven innocent. For example, 'Even if we don't have the evidence, the grand jury must have had enough evidence of his guilt or we wouldn't be here.' One repeated response to my concern about the lack of evidence that the defendant was present at the crime scene was, 'But we don't *have* that evidence!' The implication: Why are you hung up on something we don't have? Just use what we have to find the man guilty, because we know he's guilty.

"I believe there was confusion on the part of many jurors on the question of inference and common sense. Because the instructions explain we can use common sense to infer one fact from another, jurors justified their conjectures by saying, 'We are entitled to use common sense.' They would suppose a fact and cling to it, leaving aside the question of whether we had a proven basis from which to infer this fact. So they created scenarios in their minds and said, 'I believe this is what happened.' When I tried to reason from proven facts (in Brockton) to questioned facts (in Roxbury), I was told I was going about it backwards. If I suggested a possible alternate scenario, I was challenged with vehemence. In light of the hostility in the room, I could not determine whether my alternate scenario really was too far-fetched, or whether the jurors were so convinced of the defendant's guilt and so bolstered by the fact that they were the majority that they were simply unwilling to entertain other possibilities.

"An example of the juror's unwillingness to work cooperatively: We disagreed about a point in a witness' testimony which I felt was relevant to the consistency of the scenario the majority were putting forth. I said I would feel better about changing my mind if the jurors who took detailed notes (only a few of us did) would check their notes.

Not one person was willing to look at his or her notes to see if there was corroboration for one side or the other.

"My personal judgment in this case was that although the defendant is quite likely or even probably guilty, the Commonwealth did not prove his guilt beyond a reasonable doubt because it did not prove his presence at the crime scene. For my own conscience, I can only hope that Mr. Semedo is indeed guilty, because my vote sends him to jail for life.

"I gave in to pressure because I was unable to convince the other jurors of my point of view, I did not feel convinced by the arguments I heard on the other side, and I did not have the strength of character to stand my ground any longer, given the mounting anger being directed against me. I have written this letter because I want you to know our verdict was not truly unanimous. I also think judges and attorneys need to know that in spite of their careful choice of language in jury instructions, these instructions are not necessarily understood, respected, or followed."